**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

**RYAN G.,**

                                        **Plaintiff,**

        **vs.**                                                    **5:21-cv-474**
                                                                   **(MAD)**

**COMMISSIONER OF SOCIAL SECURITY,**

                                        **Defendant.**

_____

**APPEARANCES:**                              **OF COUNSEL:**

**OLINSKY LAW GROUP**                          **HOWARD D. OLINSKY, ESQ.**
250 South Clinton Street – Suite 210
Syracuse, New York 13202
Attorneys for Plaintiff

**SOCIAL SECURITY ADMINISTRATION**            **LISA SMOLLER, ESQ.**
J.F.K. Federal Building, Room 625
15 New Sudbury Street
Boston, Massachusetts 02203
Attorneys for Defendant

**Mae A. D'Agostino, U.S. District Judge:**

**MEMORANDUM-DECISION AND ORDER**

**I. INTRODUCTION**

Plaintiff protectively filed for Supplemental Security Income ("SSI") benefits in January

2017, alleging that as of October 1, 2012, he was disabled due to physical and mental

impairments.  *See* Administrative Transcript ("Tr.") at 10, 252-58, 280.  Specifically, Plaintiff

alleged that he was disabled due to right knee rupture, diaphragm paralysis, back pain, bulging

disc in the back, chronic chest pain from a gunshot wound, sleep apnea, collapsed lung, major

nerve damage of the chest, and post-traumatic stress disorder ("PTSD").  *See id.* at 280.  In a pre-

hearing brief/motion and at the hearing, Plaintiff moved to amend his alleged onset date to

January 4, 2017.  *See id.* at 10, 44, 246, 358.  Following the hearing, ALJ Jude B. Mulvey utilized the five-step process for evaluating disability claims and found on August 26, 2019, that Plaintiff had not been under a disability because he could perform other jobs in the national economy.  *See id.* at 7-24.  On February 22, 2021, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner.  *See id.* at 1-6.

On April 26, 2021, Plaintiff commenced this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) seeking review of the Commissioner's decision denying him SSI benefits.  *See* Dkt. No. 1.  Currently before the Court are the parties' cross motions for judgment on the pleadings.  *See* Dkt. Nos. 16 & 18.

## II. BACKGROUND

### A.    Plaintiff's Age, Education, and Work Experience

Plaintiff was thirty-six years old on the amended alleged onset date.  *See* Tr. at 23.  He has a ninth-grade education and reported past work as a cook and maintenance worker.  *See id.* at 281.

### B.    Medical Evidence

On March 2, 2015, Plaintiff presented to Kristin Graves, M.D., for back pain, musculoskeletal pain, and depression.  *See* Tr. at 524.  Plaintiff reported that his back pain was moderate to severe, and aggravated by changing positions.  *See id.*  Plaintiff further reported worsening depression symptoms, including difficultly concentrating, difficultly sleeping, diminished interest or pleasure in doing things, excessive worry, fatigue, feelings of guilt, and binge eating.  *See id.*  Plaintiff also reported right shoulder pain radiating to the neck.  *See id.*  Dr. Graves found Plaintiff had muscle spasms in the cervical spine, and diagnosed him with low back pain, chronic shoulder pain, neck pain, and mood disorder.  *See id.* at 526.  The record further noted that Plaintiff is 5'10" and weighed 350 pounds at the time.  *See id.* at 525.

On April 21, 2015, Plaintiff presented to Dr. Graves for right shoulder and knee pain. *See id.* at 519. Dr. Graves found that Plaintiff had tenderness of the right shoulder and severely reduced range of motion. *See id.* at 521. She also found that Plaintiff had painful range of motion of the right knee. *See id.*

On June 19, 2015, Plaintiff presented to Mary Scozzari, PA-C, for pain and dysfunction of the right knee. *See* Tr. at 373. Plaintiff reported pain along the anterior aspect of the right knee. *See id.* PA Scozzari found Plaintiff had tenderness to palpation at the medial and lateral retinaculum, but also noted that Plaintiff was in no acute distress. *See id.* at 375-76. She diagnosed Plaintiff with knee joint pain and reaffirmed this assessment in July 2015. *See id.* at 404.

On September 23, 2015, Plaintiff presented to PA Scozzari for continued right knee pain. *See id.* at 392. She noted that Plaintiff had received little relief from a cortisone injection to the right knee. *See id.* PA Scozzari found Plaintiff's gait was antalgic, and he was tender to palpation at the patella and retinaculum. *See id.* at 395. She diagnosed Plaintiff with post-traumatic osteoarthritis of the right knee. *See id.* She further noted that Plaintiff was morbidly obese and recommended that he exercise at home in an effort to lose weight. *See id.*

On January 13, 2016, Plaintiff presented to Dr. Graves for musculoskeletal pain. *See id.* at 442. Plaintiff reported he had suffered a few panic attacks and had been experiencing anxiety and depression. *See id.* at 443. However, Dr. Graves also noted that mood disorder was well controlled and his PTSD was fairly controlled. *See id.* at 442. Plaintiff also reported moderate pain in the lumbosacral spine ongoing for ten years, exacerbated by sitting and bending, as well as knee pain for seven years, worsened by walking. *See id.* at 445. Dr. Graves found that

Plaintiff had an antalgic gait, and assessed Plaintiff suffered from chronic low back pain, chronic

PTSD, chronic unspecified mood disorder, and internal derangement of the knee. *See id.* at 446.

On February 24, 2016, Plaintiff presented to Sandra Gibson, PA, for right knee and back

pain. *See id.* at 1036. PA Gibson found Plaintiff had tenderness of the lumbosacral spine

bilaterally, as well as tenderness and decreased sensation of the right knee. *See id.* PA Gibson

diagnosed Plaintiff with chronic right knee pain, osteoarthritis of the right knee, and chronic low

back pain. *See id.* These findings were affirmed in July 2016. *See id.* at 1044. Also on February

24, 2016, imaging of Plaintiff's lumbosacral spine showed mild disc space narrowing and

degenerative changes at L1-L2, L4-L5, and L5-S1. *See id.* at 604.

On July 13, 2016, Plaintiff presented to Mark A. Profetto, NP, for low back pain radiating

to the bilateral lower extremities, right shoulder pain, and right knee pain. *See id.* at 615.

Plaintiff reported that his pain was exacerbated by bending, lifting, standing, twisting, and

walking. *See id.* NP Profetto found Plaintiff had generalized tenderness throughout the lumbar

spine, and reduced sensation in the right knee. *See id.* at 617. NP Profetto also found Plaintiff's

gait was mildly antalgic. *See id.* He diagnosed Plaintiff with lumbar and cervical radiculopathy,

low back pain, neck pain, and osteoarthritis of the right knee. *See id.* at 618. NP Profetto also

noted Plaintiff had a PHQ-9 score of 20-27, indicating severe depression. *See id.*

On May 1, 2017, Plaintiff presented to Jessica Lussier, LPCA, for ongoing PTSD

symptoms. *See* Tr. at 700. Plaintiff reported that he was shot during a home invasion, and has

since had recurring nightmares about being shot. *See id.* He reported that he did not go out and

socialize, and did not have any friends. *See id.* LPCA Lussier observed that Plaintiff was tearful

and his affect was depressed. *See id.* at 704-05. Plaintiff also endorsed a depressed mood,

diminished interest, and diminished ability to think and concentrate, feelings of guilt or

worthlessness, fatigue or loss of energy, insomnia, appetite disturbance, and suicidal ideation several times per month. *See id.* at 706-07. It was also noted that he had stopped taking his mental health medications in January 2017. *See id.* at 701. LPCA Lussier indicated that Plaintiff would benefit from ongoing outpatient individual counseling, and provided him with a referral for medication management to address his psychiatric concerns and to stabilize his symptoms. *See id.* at 717.

On October 13, 2017, PA Scozzari examined Plaintiff's right knee and found tenderness of the lateral and medial patella and retinaculum, an antalgic gait, and deficits in motor strength. *See id.* at 1399. PA Scozzari also noted imaging of Plaintiff's right knee revealed severe patella-femoral degenerative change and assessed localized osteoarthritis of the right knee. *See id.* at 1400. Additionally, PA Scozzari noted that, despite the significant degenerative changes underneath the patellofemoral joint, he is not a candidate for surgery due to his weight. *See id.*

On January 4, 2019, Plaintiff presented to Robert Richman, PA, with acute exacerbation of chronic low back pain radiating down to the right leg. *See* Tr. at 1073. Plaintiff reported this pain occurred after bending over to clean. *See id.* PA Richman found Plaintiff had tenderness on the left side of his lumbosacral spine, decreased sensation at L4-S1, and reduced extension of the right knee. *See id.* at 1075. PA Richmond diagnosed Plaintiff with lumbar radiculopathy. *See id.* at 1076. PA Richmond also noted that Plaintiff's mood and affect were pleasant and appropriate, his judgment was intact, his insight was normal without delusions or hallucinations, and that he denied suicidal ideation. *See id.* On January 15, 2019, Plaintiff received injections of dexamethasone at the L4-L5 and L5-S1 levels based on the referral of PA Richman. *See id.* at 1078.

On July 31, 2019, Plaintiff presented to Michael Clarke, M.D., for pain/dysfunction of the right knee.  *See id.* at 1861.  Plaintiff reported he had recently fallen on his knee and had since been unable to straighten his leg.  *See id.*  Dr. Clarke found Plaintiff's gait was antalgic, and was tender to palpation at the medial and lateral patella and retinaculum.  *See id.* at 1863.  Dr. Clarke observed that Plaintiff was unable to straighten his leg, and could not hold it at extension.  *See id.*  Dr. Clarke diagnosed Plaintiff with right knee pain, and ordered imaging of the right knee to be performed.  *See id.*  On August 5, 2019, imaging of Plaintiff's right knee showed advanced chondrosis and mild osteoarthropathy in the patellofemoral joint.  *See id.* at 1860.

## C.   Opinion Evidence

On September 28, 2015, Plaintiff presented to Jeanne Shapiro, Ph.D., for a consultative psychological evaluation.  *See* Tr. at 1851-54.  Plaintiff reported that he was unable to work due to his "crazy paranoia" and difficulty being in social situations.  *See id.* at 1851.  Plaintiff further reported that he had difficulty falling asleep and typically work up five times per night.  *See id.* at 1852.  Plaintiff was shot during a home invasion in 2011, and has always been worried that the shooter would come back to kill him.  *See id.*  Plaintiff suffered from nightmares, flashbacks, and recurrent distressing memories of the invasion, and does not trust other people.  *See id.*  Plaintiff reported that he did not leave his home if he did not have to, and had no friends.  *See id.*  Plaintiff reported that he was depressed, unmotivated, lethargic, self-isolating, and has no interest in people or pleasurable activities.  *See id.*  Plaintiff also reported that he was forgetful and had difficulty attending and concentrating.  *See id.*  Dr. Shapiro found Plaintiff's mood was depressed, he appeared sad, and he became tearful at one point during the interview.  *See id.* at 1853.  Dr. Shapiro diagnosed Plaintiff with PTSD and unspecified depressive disorder.  *See id.* at 1854.  She opined that Plaintiff had mild-to-moderate limitations in maintaining attention and concentration,

and making appropriate decisions. *See id.* She also opined that Plaintiff had moderate limitations in his abilities to consistently relate to and interact with others, as well as dealing with stress. *See id.*

On June 8, 2017, state agency medical consultant Richard H. Cyr-McMillon, Ph.D., reviewed Plaintiff's medical file and found he had moderate limitations in interacting with others; in concentration, persistence, or maintaining pace; and adapting or managing oneself. *See id.* at 116. Specifically, Dr. Cyr-McMillon found Plaintiff had moderate limitations in his abilities to work in coordination with or in proximity to others with being distracted by them; interact appropriately with the general public; and respond appropriately to changes in the work setting. *See id.* at 123-24. He opined Plaintiff may require a position with minimal public contact, he can perform some complex tasks, and he may have some difficulty adapting to changes in the workplace. *See id.*

On February 26, 2019, LMSW Njoku completed a mental health assessment, in which she diagnosed Plaintiff with PTSD and agoraphobia with panic disorder. *See* Tr. at 1435. She opined that Plaintiff was moderately limited in his abilities to follow, understand, and remember simple instructions, and perform low stress, simple and complex tasks independently. *See id.* LMSW Njoku opined Plaintiff was severely limited in his abilities to interact with others and maintain socially appropriate behavior without exhibiting behavior extremes; maintain a schedule and attend to a daily routine; maintain attention and concentration for tasks; and demonstrate the ability to function in a work setting. *See id.*

On May 6, 2019, Plaintiff presented to Elke Lorensen, M.D., for a consultative examination. *See id.* at 1079-88. Plaintiff reported back pain, left-sided pain, and nerve damage. *See id.* at 1079. Plaintiff reported his pain was in the lumbar spine and he could not lift anything

or bend. *See id.* He also reported pain in the left side of his chest radiating in to his back. *See id.* Dr. Lorensen noted Plaintiff had three surgeries on his right knee and still complained of chronic right knee pain. *See id.* Dr. Lorensen also noted Plaintiff declined to squat or walk on his heels and toes, and had reduced range of motion of the right knee. *See id.* at 1080-81. Dr. Lorensen diagnosed Plaintiff with back pain, left-sided chest pain, and right knee pain. *See id.* at 1082. Dr. Lorensen opined that Plaintiff had no gross limitations sitting, standing, walking, reaching, or handling. *See id.* Dr. Lorensen also opined that Plaintiff should avoid smoke, dust, and other respiratory irritants. *See id.*

Dr. Lorensen also completed a medical source statement in which she opined that Plaintiff could continuously lift and carry at least ten pounds; he could sit or stand for eight hours per day, and walk for four hours per day; he could continuously handle, finger, and feel bilaterally; he could occasionally operate foot controls bilaterally; he could occasionally climb stairs and ramps, stoop, kneel, crouch, and crawl; he could never climb ladders or scaffolds, or balance; he could occasionally operate a motor vehicle or be exposed to vibrations; and he could never be exposed to unprotected heights, mechanical moving parts, humidity or wetness, pulmonary irritants, and extreme temperatures. *See id.* at 1083-87.

Also on May 6, 2019, Plaintiff presented to Dennis M. Noia, Ph.D., for a consultative psychological evaluation. *See id.* at 1091-94. Plaintiff reported that he was "not happy about being here today," and Dr. Noia noted Plaintiff appeared slightly anxious. *See id.* at 1093. Dr. Noia also found Plaintiff's recent and remote memory skills were mildly impaired. *See id.* Dr. Noia opined that Plaintiff had mild limitations in understanding, remembering, and applying complex directions; interacting adequately with supervisors, coworkers, and the public; and regulating emotions, controlling behavior, and maintaining well-being. *See id.* at 1094. He

further found that Plaintiff had no limitations maintaining personal hygiene, wearing appropriate attire, being aware of normal hazards, and taking appropriate precautions. *See id.* Dr. Noia diagnosed Plaintiff with PTSD and unspecified depressive disorder. *See id.*

Again on May 6, 2019, Plaintiff presented to Kalyani Ganesh, M.D., for a consultative examination. *See* Tr. at 1098-1107. Plaintiff reported constant neck and lower back pain, increasing with any sort of movement. *See id.* at 1098. Dr. Ganesh found Plaintiff had a normal gait with no acute distress, but noted that he could not walk on his heels and toes without difficulty and could not squat. *See id.* at 1099. Dr. Ganesh also noted that Plaintiff needed no help changing for the exam or getting on and off the exam table, and that he was able to rise from a chair without difficulty. *See id.* Dr. Ganesh found that Plaintiff had reduced range of motion of the lumbar spine. *See id.* at 1100. He diagnosed Plaintiff with neck and lower back pain and opined that Plaintiff did not have any significant functional limitations, apart from needing to avoid exposure to pulmonary irritants. *See id.* at 1102-07.

On June 25, 2019, LMSW Njoku completed a medical statement regarding Plaintiff's mental limitations. *See id.* at 1362-64. She opined Plaintiff had extreme limitations in his abilities to interact appropriately with the public; interact appropriately with supervisors; interact appropriately with coworkers; and respond appropriately to usual work situations and to changes in a routine work setting. *See id.* at 1363. LMSW Njoku explained these limitations were due to Plaintiff's diagnosis of PTSD and agoraphobia with panic disorder, as well as Plaintiff's trust issues and difficulty making appointments. *See id.* LMSW Njoku noted Plaintiff had trouble with anger and mood instability, and that he cannot adapt to change or conflict well. *See id.* LMSW Njoku also noted that Plaintiff became easily upset during sessions. *See id.*

On July 22, 2019, LMSW Njoku completed another medical source statement, in which she noted Plaintiff's diagnoses of PTSD and agoraphobia with panic disorder. *See* Tr. at 1446. LMSW Njoku noted Plaintiff's symptoms included anhedonia or pervasive loss of interest in almost all activities; appetite disturbance with weight change; decreased energy; feelings of guilt or worthlessness; generalized persistent anxiety; mood disturbance; difficulty thinking or concentrating; recurrent and intrusive recollections of a traumatic experience; paranoid thinking or inappropriate suspiciousness; emotional withdrawal or isolation; disorientation to time and place; persistent disturbance of mood or affect; easy distractibility; memory impairments; sleep disturbance; and panic attacks. *See id.* LMSW Njoku opined Plaintiff was seriously limited, but not precluded, in his abilities to carry out very short and simple instructions; deal with normal work stress; maintain socially appropriate behavior; and use public transportation. *See id.* at 1447. Additionally, she opined Plaintiff was unable to meet competitive standards in his abilities to remember work-like procedures; understand and remember very short and simple instructions; maintain regular attendance and be punctual within customary, usually strict tolerances; sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being unduly distracted; make simple work-related decisions; ask simple questions or request assistance; respond appropriately to changes in a routine work setting; and travel in unfamiliar places. *See id.* LMSW Njoku also opined Plaintiff had no useful ability to function in his abilities to maintain attention for two-hour segments; complete a normal workday and workweek without interruptions from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors; get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; and interact appropriately with the general

public.  *See id.*  LMSW Njoku explained these limitations were attributable to Plaintiff's lack of trust, disorganized thoughts, and issues with large groups due to PTSD.  *See id.*  Finally, LMSW Njoku opined that Plaintiff could be expected to be off task for more than twenty percent of the workday, that his impairments were likely to cause good days and bad days, that he would be absent from work more than four days per month, and that his lack of ability to remember and concentrate on activities would be an issue in the work setting.  *See id.* at 1448.

On July 25, 2019, Dr. Graves completed a medical source statement, noting Plaintiff experienced lumbar radiculopathy, derangement of the right knee, cervical radiculopathy, sleep apnea, PTSD, anxiety disorder, irritability, and hypertension.  *See* Tr. at 1469.  Dr. Graves noted that Plaintiff's symptoms included depressed mood, irritability, chronic back and knee pain, difficulty ambulating, panic attacks, and shortness of breath.  *See id.*  Dr. Graves also noted Plaintiff's medications caused side effects, including chronic fatigue, dizziness, and movement, control or sensation disturbance.  *See id.*  Dr. Graves opined that Plaintiff could stand, walk, or sit for less than two hours each day; Plaintiff would need to be able to change positions at will; he may benefit from a cane; he could rarely lift less than ten pounds, and never lift more than that amount; he could rarely twist or climb stairs; he could never stoop, bend, crouch, squat, or climb ladders; he could rarely look down, turn his head, or look up; he could rarely hold his head in a static position; and he cold occasionally handle, finger, and reach.  *See id.* at 1469-70.  Dr. Graves also opined that Plaintiff would need frequent breaks to the point that he will need to rest more than he can work; he would be off task for more than twenty percent of the workday; and he would be absent from work for more than four days per month.  *See id.* at 1471.  Dr. Graves also noted Plaintiff had panic attacks and anxiety which affect him greatly and limit his ability to

11

function in the work environment, as well as reactive airways that would occasionally require him to avoid temperature extremes.  *See id.*

**D.      The ALJ's Decision**

In her decision, the ALJ found that Plaintiff had not engaged in substantial gainful activity since January 4, 2017, the application date.  *See* Tr. at 12.  At step two, the ALJ found that Plaintiff suffers from the following severe impairments: degenerative disc disease; cervical radiculopathy; lumbar radiculopathy; osteoarthrosis of the knees; right knee impairment; obesity; trauma and stress-related disorder; depressive, bipolar and related disorder; and anxiety and obsessive-compulsive disorder.  *See id.* at 13.  At step three, the ALJ held that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. §§ 416.920(d), 416.925, and 416.926.  *See id.* at 13-15.

Next, the ALJ determined that Plaintiff had the residual functional capacity ("RFC") to perform light work, with the following restrictions:

> he is limited to simple, routine, repetitive work in an environment free of fast paced production requirements with few, if any, changes in workplace setting.  The claimant should have no more than occasional contact with coworkers and supervisors and should have no more than incidental contact with the public.  I define incidental as more than never and less than occasional, simply the job should not involve direct interaction with the public but the claimant does not need to be isolated away from the public.  The claimant cannot climb ladders, ropes or scaffolds but can occasionally climb stairs, stoop, crouch, crawl and push/pull.  He can kneel incidentally.  The claimant cannot work at unprotected heights or near moving mechanical parts.  He cannot be exposed to humidity/wetness or extreme temperatures.  The claimant can occasionally operate a motor vehicle and be exposed to vibrations.

*Id.* at 15-16.

At the fourth step, the ALJ determined that Plaintiff has no past relevant work.  *See id.* at 23.  Further, the ALJ noted that Plaintiff was thirty-six years old on the date his application was

filed, that he has limited education and is able to communicate in English. *See id.* The ALJ also found that transferability of job skills is not an issue in this case because Plaintiff does not have any past relevant work. *See id.* At the fifth and final step, the ALJ determined that other work exists in significant numbers in the national economy that Plaintiff can do, taking into account Plaintiff's RFC, his age, education, and work experience. *See id.* at 23-24. Specifically, relying on the testimony of a vocational expert who was informed of Plaintiff's RFC and relevant characteristics, the ALJ found that Plaintiff is able to perform the representative occupations of a marker, a router, and a photocopier machine operator. *See id.*

## III. DISCUSSION

**A.    Standard of Review**

### *1. Substantial Evidence*

A court's review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence and the correct legal standards were applied. *See Poupore v. Astrue*, 566 F.3d 303, 305 (2d Cir. 2009). "Substantial evidence means 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938)).

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988) (citing *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S. Ct. 456, 95 L. Ed. 456 (1951)). If the Commissioner's disability determination is supported by substantial evidence, that determination is conclusive. *See id.*

Indeed, where evidence is deemed susceptible to more than one rational interpretation, the Commissioner's decision must be upheld — even if the court's independent review of the evidence may differ from the Commissioner's.  *See Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982); *see also Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992) (citations omitted).  However, "where there is a reasonable basis for doubting whether the Commissioner applied the appropriate legal standards," the decision should not be affirmed even though the ultimate conclusion reached is arguably supported by substantial evidence.  *Martone v. Apfel*, 70 F. Supp. 2d 145, 148 (N.D.N.Y. 1999) (citing *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987)).

### *2. Disability Determination — The Five-Step Evaluation Process*

The Social Security Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  In addition, the Act requires that a claimant's:

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

*Id.* § 423(d)(2)(A).

The ALJ must follow a five-step evaluation process in deciding whether an individual is disabled.  *See* 20 C.F.R. §§ 404.1520, 416.920.  At step one, the ALJ must determine whether the claimant engaged in substantial gainful activity during the relevant period.  A claimant engaged in

substantial gainful activity is not disabled, and is therefore not entitled to benefits.  *See id.* §§ 404.1520(b), 416.920(b).

If the claimant has not engaged in substantial gainful activity, then step two requires the ALJ to determine whether the claimant has a severe impairment or combination of impairments which significantly restricts his or her physical or mental ability to perform basic work activities. *See id.* §§ 404.1520(c), 416.920(c).

If the claimant is found to suffer from a severe impairment or combination of impairments, then step three requires the ALJ to determine whether, based solely on medical evidence, the impairment or combination of impairments meets or equals an impairment listed in Appendix 1 of the regulations (the "Listings").  *See id.* §§ 404.1520(d), 416.920(d); *see also id.* Pt. 404, Subpt. P, App. 1.  If the claimant's impairment or combination of impairments meets one or more of the Listings, then the claimant is "presumptively disabled."  *Martone*, 70 F. Supp. 2d at 149 (citing *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984)).

If the claimant is not presumptively disabled, step four requires the ALJ to assess whether, despite the claimant's severe impairment, he or she has the residual functional capacity ("RFC") to perform past relevant work.  *See* 20 C.F.R. §§ 404.1520(f), 416.920(f).  The burden of proof with regard to these first four steps is on the claimant.  *See Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996) (citing *Carroll v. Sec'y of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983)).

If it is determined that the claimant cannot perform his or her past relevant work, the burden shifts to the Commissioner for step five.  *See Perez*, 77 F.3d at 46 (citing *Carroll*, 705 F.2d at 642).  This step requires the ALJ to examine whether the claimant can do any type of work.  *See* 20 C.F.R. §§ 404.1520(g), 416.920(g).  The regulations provide that factors such as a claimant's age, physical ability, education, and previous work experience should be evaluated to

determine whether a claimant retains the RFC to perform work in any of five categories of jobs: very heavy, heavy, medium, light, and sedentary.  *See Perez*, 77 F.3d at 46 (citing 20 C.F.R. § 404, Subpt. P, App. 2).  "[T]he Commissioner need only show that there is work in the national economy that the claimant can do; he need not provide additional evidence of the claimant's residual functional capacity."  *Poupore*, 566 F.3d at 306 (citing 20 C.F.R. § 404.1560(c)(2)).

### 3. RFC Determination

Pursuant to Social Security Ruling ("SSR") 96-8p, an "RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis.  A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule."  SSR 96-8p.  Additionally, an RFC "does not represent the least an individual can do despite his or her limitations or restrictions, but the most."  *Id.*; *see also* 20 C.F.R. § 416.945(a)(1).  In order to determine an RFC, the adjudicator is instructed to base the assessment on "all of the relevant medical and other evidence."  20 C.F.R. § 416.945(a)(3).

Regulations of the Social Security Administration ("SSA") set forth the proper considerations to be used in evaluating medical opinion evidence to establish a claimant's RFC.  *See* 20 C.F.R. § 416.927.  The Regulations provided that, generally, "we give more weight to the opinion of a source who has examined you than the opinion of a source who has not examined you."  20 C.F.R. § 416.927(c)(1).  In order to determine what weight to assign the opinion, the ALJ must consider the following factors: length, nature, and extent of the treating relationship; supportability of the opinion; consistency of the opinion with other evidence in the record; the specialization of the source; and any other factors that support or contradict the opinion.  *See id.* § 416.927(c)(2)-(6).

**B.** **Application**

In his motion, Plaintiff notes that the ALJ determined he had the RFC to perform light work, with additional exertional and non-exertional limitations. *See* Dkt. No. 16 at 15 (citing Tr. at 15-16). Plaintiff argues, however, that this RFC was incomplete because the ALJ failed to afford proper weight to the opinion of LMSW Njoku. *See id.* Additionally, Plaintiff contends that the RFC was unsupported by substantial evidence because the ALJ failed to properly weigh the opinion of Dr. Graves. *See id.* at 21-25. The Court will address each of these arguments in turn.[1]

*1. LMSW Njoku*

As discussed above, LMSW Njoku submitted multiple medical opinions regarding Plaintiff's mental functioning. In February 2019, LMSW Njoku completed an Examination for Employability Assessment for the Onondaga County Department of Social Services in which she noted that Plaintiff was diagnosed with PTSD and agoraphobia with panic disorder. *See* Tr. at 1435-36. She opined that Plaintiff was severely limited in his ability to interact with others and maintain socially appropriate behavior without exhibiting behavior extremes, maintain a schedule and attend to a daily routine, maintain attention and concentration for rote tasks, and function in a work setting. *See id.* at 1435. LMSW Njoku ultimately concluded that Plaintiff appeared permanently disabled. *See id.* at 1436.

In June 2019, LMSW Njoku completed a Medical Statement of Ability to do Work-Related Activities (Mental). *See id.* at 1362-64. She found that Plaintiff had no impairment in his ability to understand, remember, and carry out instructions, but that he had extreme limitations in

---

[1] The Court notes that, while Plaintiff at times frames both of his arguments as challenges to the ALJ's RFC finding, the central focus of his claims is the ALJ's evaluation of the medical opinions and, therefore, the Court focuses its discussion on this issue.

his ability to interact appropriately with the public, supervisors, and co-workers and respond appropriately to usual work situations and changes in a routine work setting. *See id.* at 1362-63. LMSW Njoku further added that Plaintiff had difficulty with anger and mood stability and, therefore, he could not adapt to change or conflict well. *See id.* at 1363.

On July 22, 2019, LMSW Njoku completed a Medical Source Statement in which she determined that Plaintiff was unable to meet competitive standards in remembering work-like procedures, understanding and remembering very short and simple instructions, maintaining regular attendance, sustaining an ordinary routine without special supervision, working in coordination with others without being unduly distracted, making simple work-related decisions, asking simple questions, and responding appropriately to changes in a routine work setting. *See* Tr. at 1447. She also found that Plaintiff had no useful ability to function in carrying out very short and simple instructions, completing a normal workweek, performing at a consistent pace without an unreasonable number of breaks, accepting instructions and responding appropriately to criticism from supervisors, getting along with co-workers without being unduly distracting, and interacting appropriately with the general public. *See id.* LMSW Njoku added that Plaintiff's psychiatric condition exacerbated his experience of pain or other physical symptoms, he had repeated episodes of deterioration or decompensation in a work setting, he had deficiencies in concentration, persistence, and pace resulting in a failure to complete tasks in a timely manner, he would be off task for more than twenty percent of the day, and he would miss more than four days of work each month. *See id.* at 1448.

In her decision, the ALJ noted that LMSW Njoku submitted multiple opinions wherein she assessed extreme limitations and concluded that Plaintiff was unable to work and was permanently disabled. *See* Tr. at 20. The ALJ concluded that the opinions were entitled to

minimal weight "because she is not an acceptable medical source, her findings are inconsistent with the medical evidence of record and her conclusion speaks to an issue, which is reserved for the Commissioner of Social Security." *Id.*

Contrary to Plaintiff's contentions, the ALJ's finding is supported by substantial evidence and the decision to afford the opinions of LMSW Njoku minimal weight was adequately explained. SSR 06-3p[2] requires the ALJ to evaluate the opinions of non-acceptable medical sources by looking at the following: how long the source has known and how frequently the source has seen the individual; how consistent the opinion is with other evidence; the degree to which the source presents relevant evidence to support an opinion; how well the source explains the opinion; whether the source has a specialty or area of expertise related to the individual's impairment; and any other factors that tend to support the opinion.

The ALJ explained that, although Plaintiff sometimes demonstrated more significant impairments, his mental status examinations were often relatively benign. *See* Tr. at 20 (citing Exs. B7F, B10F, B13F, B15F, B17F, B21F, B26F and B29F [Tr. at 630-34, 718-22, 1036-78, 1091-97, 1110-13, 1306-21, 1420-30, and 1450-58]). Multiple reports generally indicate that Plaintiff's mood and affect were pleasant and appropriate, his judgment was intact, his insight was normal without delusions or hallucinations, and/or he denied suicidal ideation. *See* Tr. at 1038, 1044, 1050, 1054, 1059, 1066, 1075, 1423, 1428, and 1457-58. Plaintiff also reported in his January 2019 Review of System that he was negative for agitation and behavioral problems. *See id.* at 1319. At the May 2019 psychological consultative examination, Plaintiff did not report any significant depressive, manic, or anxiety related symptoms or symptoms from a formal thought

---

[2] On March 27, 2017, the Social Security Administration rescinded SSR 06-3p. However, since Plaintiff's claim was filed on January 4, 2017, SSR 06-3p still applies.

disorder and he stated that his treatment usually controlled his depression and PTSD. *See id.* at 1092.  Dr. Noia further found that Plaintiff was cooperative, his social skills were adequate, his motor behavior was normal, his speech was fluent, and his thought processes were coherent and goal-directed with no evidence of delusions, hallucinations, or disordered thinking. *See id.* at 1092-93.  Dr. Noia added that Plaintiff's attention and concentration were intact, his intellectual functioning was estimated to be average, his memory skills were only mildly impaired, his general fund of knowledge appeared appropriate to experience, and his insight and judgment were good. *See id.* at 1093.  Dr. Noia concluded that Plaintiff had at most mild mental limitations. *See id.* at 1094.

Plaintiff argues that the ALJ failed to consider LMSW Njoku's explanations for her opinions and her treatment relationship and instead rejected the opinions based on her credentials. *See* Dkt. No. 16 at 18.  However, the ALJ was allowed to rely on LMSW Njoku's status as a non-acceptable medical source in finding that her opinion was entitled to less weight. *See Martinez v. Comm'r of Soc. Sec.*, No. 3:16-cv-908, 2017 WL 2633532, *9 (N.D.N.Y. June 15, 2017) ("Here, the ALJ provided good reasoning for affording [the social worker's] opinion very little weight" where, among other things, the ALJ noted that the social worker "was not an acceptable medical source").  Moreover, to the extent that Plaintiff is arguing that the ALJ had to specifically articulate her consideration of the regulatory factors, that is clearly belied by SSR 06-03p.

To begin, "while the ALJ is certainly free to consider the opinion of [non-acceptable medical sources] in making his overall assessment of a claimant's impairments and residual abilities, those opinions do not demand the same deference as those of a treating physician." *Genier v. Astrue*, 298 Fed. Appx. 105, 108 (2d Cir. 2008) (citation omitted).  And, as SSR 06-03p explains, the regulatory factors "can be applied" to opinions from other sources but not every

factor will apply in every case and greater weight can be given to an opinion from an acceptable medical source. *See* SSR 06-03p, 2006 WL 2329939, *4-5 (Aug. 9, 2006).  Moreover, the ALJ merely needs to show that an opinion from an "other source" was considered, and to do so, he needs to explain the weight given to the opinion. *See id.* at *6.  Here, the ALJ complied with that requirement, as she stated that the opinions were entitled to minimal weight, provided three reasons for her finding, and then discussed other evidence in the record that supported this conclusion. *See* Tr. at 20.

Plaintiff also argues that the ALJ erred when she entirely discounted LMSW Njoku's findings because "she offered a disability opinion in the medical records[.]" Dkt. No. 16 at 19-20. Pursuant to the prior regulations, an opinion on an issue reserved to the Commissioner is not a medical opinion and, therefore, it does not have to be evaluated or weighed. *See* 20 C.F.R. § 416.927(d).  Further, the record makes clear that the ALJ properly considered those aspects of LMSW Njoku's determinations that were not opinions on issues reserved to the Commissioner. *See* Tr. at 19-22.

Plaintiff also contends that the ALJ's error is not harmless because, based on the vocational expert's testimony and SSR 85-15, if LMSW Njoku's opinions were credited, he would have been found disabled. *See* Dkt. No. 16 at 20-21.  Plaintiff, however, fails to point to any evidence in the record that supports LMSW Njoku's opinions or rebuts the ALJ's finding that his mental status examination findings were often benign.  As such, Plaintiff has failed to demonstrate that he could not perform the basic mental demands of unskilled work outlined in SSR 85-15.  And since the ALJ properly discounted LMSW Njoku's findings of severe limitations, the ALJ was not required to credit the vocational expert's testimony that was given in response to a hypothetical based on those findings. *See McIntyre v. Colvin*, 758 F.3d 146, 151

(2d Cir. 2014) ("An ALJ may rely on a vocational expert's testimony regarding a hypothetical as long as 'there is substantial record evidence to support the assumption[s] upon which the vocational expert based his opinion,' ... and accurately reflect the limitations and capabilities of the claimant involved") (quotation and other citation omitted).

Accordingly, the Court finds that substantial evidence supports the ALJ's decision to given the opinions of LMSW Njoku minimal weight.

### 2. Dr. Kristen Graves

Although Dr. Graves submitted multiple medical opinions, Plaintiff only challenges that ALJ's evaluation of Dr. Graves' July 2019 opinion. *See* Dkt. No. 16 at 21.  In that assessment, Dr. Graves noted that Plaintiff had trouble ambulating and difficulty leaving the house due to anxiety and panic. *See* Tr. at 1469.  Dr. Graves then opined that Plaintiff could sit and stand/walk for less than two hours each in an eight-hour day, he needed to shift positions at will, and he might benefit from using a cane, but he avoided doing so. *See id.* at 1470.  Dr. Graves also found that Plaintiff could rarely lift less than ten pounds, twist, climb stairs, and hold his head in a static position; he could never stoop/bend, crouch/squat, or climb ladders; and he could occasionally look up and down, turn his head, and use his arms, hands, and fingers. *See id.*  Dr. Graves further determined that Plaintiff needed frequent unscheduled breaks and would need to rest more than he could work, that he would be off task more than twenty percent of the time, and that he would miss more than four days of work per month. *See id.* at 1471.

The ALJ evaluated Dr. Graves' opinions and found that because she had relevant professional expertise and a treating relationship with Plaintiff, her opinions were entitled to some weight to the extent that her findings were supported by objective medical evidence. *See* Tr. at 22.  The ALJ went on to conclude, however, that Dr. Graves' opinion that Plaintiff needed

unscheduled breaks appeared to be based on his subjective reports rather than objective evidence and was somewhat speculative.  *See id.*  Similarly, the ALJ found that Dr. Graves' statement that Plaintiff might benefit from the use of a cane was also speculative.  *See id.*  The ALJ further determined that the restrictions on time off task and absences were speculative as well given that the record did not indicate that Plaintiff had a history of missed appointments and his mental status examinations did not show deficits in concentrations; and, therefore, the ALJ rejected these restrictions.  *See id.*

The ALJ further rejected all conclusory statements regarding disability and functioning in the work setting as those statement spoke to issues reserved to the Commissioner.  *See id.*  The ALJ added that, as discussed above, the objective medical evidence and significant opinion evidence in the record, as well Plaintiff's activity level, did not support Dr. Graves' extreme limitations.  *See id.*  As an example, the ALJ noted that Dr. Graves assessed significant sitting, standing, and walking limitations, yet Plaintiff was able to move from New York State to North Carolina and back.  *See id.*  The ALJ concluded that the ability to travel to and from North Carolina supported a finding that Plaintiff could sit and stand/walk more than the "less than two hours" total in an eight-hour workday that Dr. Graves assessed.  *See id.*  The ALJ additional found that while Dr. Graves imposed occasional limitations for grasping and turning objects and performing fine manipulation, Plaintiff did not report any limitations regarding these activities. *See id.*  The ALJ ultimately determined that the portions of Dr. Graves' opinions that were consistent with the record showed that Plaintiff had exertional, postural, and mental limitations that could be accommodated by the RFC finding.  *See id.*

Contrary to Plaintiff's assertions, the reasons the ALJ cited for discounting Dr. Graves' opinion were not erroneous and unsupported by substantial evidence.  Plaintiff contends that the

ALJ's determination that the opined limitations in off-task time and absences and alleged lack of

concentration deficits was based on "cherry-picked evidence." *See* Dkt. No. 16 at 22-23. In

making this claim, Plaintiff relies in part on medical reports from 2015, more than fifteen months

prior to his amended alleged onset date. *See id.* at 23 (citing Tr. at 524, 1852 and 1854). Courts

have regularly found that "[m]edical evidence that predates the alleged disability onset date is

ordinarily not relevant to evaluating a claimant's disability." *Moore v. Comm'r of Soc. Sec.*, No.

1:16-cv-270, 2017 WL 1323460, *9 (N.D.N.Y. Apr. 10, 2017) (citations omitted). Even if these

findings did relate to the period at issue, they fail to show any deficits in concentration. While

Plaintiff complained of difficulty concentrating in both examination reports, *see* Tr. at 524, 1852,

there were no such findings on examination. Rather, in March 2015, Dr. Graves observed that

there was no agitation or pressured speech, Plaintiff's affect was appropriate, his insight was

normal, and he was not experiencing suicidal ideation. *See id.* at 526. Further, at the September

2015 consultative examination, Dr. Shapiro found that Plaintiff's attention and concentration were

intact. *See id.* at 1853.

As for the other referenced medical reports, in May 2017, Plaintiff again reported

concentration difficulties, but his provider observed that he had coherent organization of thought

and unremarkable thought content. *See* Tr. at 705-07. The remaining citations are to portions of

LMSW Njoku's opinions which, as explained above, the ALJ properly gave minimal weight.

Plaintiff next attacks the ALJ's finding that his activities were inconsistent with Dr.

Graves' opinion. *See* Dkt. No. 16 at 23. Plaintiff claims that "[t]he ALJ's reasoning appears to

indicate that an isolated instance of Plaintiff traveling to North Carolina and back was indicative

of his ability to sit, stand, or walk for more than two hours each per day on a regular, sustained

basis." *Id.* Plaintiff claims that it was improper for the ALJ to rely on this "one-time occurrence."

*Id.* The ALJ, however, discussed significantly more than Plaintiff's travel to and from North Carolina. Elsewhere in her decision, the ALJ noted that Plaintiff "is able to attend to his personal care needs, move from New York State to North Carlina and back, care for his dog, drive, shop, manage money, watch television, listen to the radio, go to a birthday party at a country club and work on his Jeep." *See* Tr. at 17. The ALJ properly considered this evidence and this aspect of the ALJ's decision is supported by substantial evidence. *See Wavercak v. Astrue*, 420 Fed. Appx. 91, 94 (2d Cir. 2011); *see also Jeanette J. v. Saul*, No. 6:19-cv-795, 2020 WL 4932047, *5 (N.D.N.Y. Aug. 24, 2020) ("It is proper to read the ALJ's decision as a whole and it would be a needless formality to have the ALJ repeat substantially similar factual analyses").

Plaintiff next contends that the ALJ erred when she found that the objective evidence fails to support Dr. Graves' opinion. *See* Dkt. No. 16 at 23. Plaintiff claims that "there were copious amounts of evidence on the record consistent with Dr. Grave's [sic] opinions." *Id.* at 23-24. But "where there is substantial evidence supporting the appellant's view is not the question here; rather, we must decide whether substantial evidence supports *the ALJ's decision*." *Bonet ex rel T.B. v. Colvin*, 523 Fed. Appx. 58, 59 (2d Cir. 2013) (emphasis in original). And the ALJ provided a detailed summary of the evidence that supported her finding, including Plaintiff's daily activities, medical reports, and opinion evidence. *See* Tr. at 17-21. Moreover, as the Commissioner notes, this is not a case where the ALJ disputed the presence of severe physical impairments, as she found that Plaintiff's degenerative disc disease, cervical radiculopathy, lumbar radiculopathy, osteoarthrosis of the knee, right knee impairment, and obesity were severe impairments. *See id.* at 13. The ALJ then limited Plaintiff to light work with the additional restrictions that he could not climb ladders, ropes, or scaffolds; he could occasionally climb stairs, stoop, crouch, crawl, and push/pull; he could kneel on an incidental basis; he could not work at

unprotected heights or near moving mechanical parts; he could not be exposed to humidity, wetness, or extreme temperatures; and he could occasionally operate vehicles and be exposed to vibrations. *See id.* at 15-16.

Additionally, the evidence Plaintiff cites in support of his position fails to substantiate Dr. Graves' extreme limitations. For example, some of the medical reports pre-date Plaintiff's alleged onset date by fifteen-to-twenty-three months. *See* Dkt. No. 16 at 23 (citing Tr. at 376, 395, 404, 521, and 526). And the medical records from 2016 merely show an antalgic gait, lumbar tenderness, and decreased sensation, which fail to corroborate Dr. Graves' finding of extreme limitations. *See* Tr. at 445-46, 617, 1038, and 1044. These same records also demonstrate that Plaintiff's flexion and extension were not restricted, that he had full range of motion in both knees with no motor weakness or tenderness, and that he had full range of motion in his lower extremities with normal strength. *See id.* at 617, 1038, and 1044.

Plaintiff also references records from 2017 and 2019, which similarly fail to substantiate Dr. Graves' opinion. For example, Plaintiff's October 2017 and July 2019 medical reports demonstrate that while Plaintiff had abnormal motor strength and tenderness in the right knee, moderate motor atrophy, and an antalgic gait, he did not require an assistive device, his sensation and range of motion were normal, and his stability tests were generally negative. *See id.* at 1399, 1863. Dr. Clarke also concluded that Plaintiff's percentage of temporary impairment was zero. *See id.* at 1400, 1864. Additionally, Plaintiff's January electromyogram and nerve conduction studies were normal. *See id.* at 1416. Moreover, Plaintiff's January 2019 medical report revealed tenderness in his lumbosacral spine, right knee extension of four out of five, and decreased sensation in the right lower extremity, but this fails to establish great functional restrictions than provided for in the RFC. *See id.* at 1075.

The ALJ's decision is further supported by Dr. Lorensen's May 6, 2019 consultative examination.  In his report, Dr. Lorensen observed that Plaintiff had a normal gait with no assistive device, his cervical spine motion was full, his straight leg raising was negative bilaterally, he had full range of motion in his shoulders, elbows, forearms, wrists, ankles, and hips, and his right knee flexion was 130 degrees with full flexion on the left.  *See* Tr. at 1080-81. Dr. Lorensen also found that Plaintiff's joints were non-tender, there were no sensory deficits, his strength was rated as five out of five in his upper and lower extremities, he had no muscle atrophy, his hand and finger dexterity were intact, and his grip strength was rated as five out of five bilaterally.  *See id.* at 1081.  Dr. Lorensen concluded that Plaintiff had no gross limitations in sitting, standing, walking, reaching with his arms, and handling small objects.  *See id.* at 1082.

Dr. Ganesh made similar findings in his orthopedic consultative examination but also concluded that Plaintiff had no cervical or paracervical pain or spasms, spinal or paraspinal tenderness, or sacroiliac joint or sciatic notch tenderness, and he had full range of motion in his knees with absent sensation over the right knee.  *See id.* at 1099-1100.  Dr. Ganesh determined that Plaintiff had no gross limitations and that his overall effort and cooperation were poor.  *See id.* at 1100.

Upon review, the Court finds that the ALJ 's decision was supported by substantial evidence and must be affirmed.

### IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that the Commissioner's decision denying benefits is **AFFIRMED**; and the Court further

**ORDERS** that Plaintiff's motion for judgment on the pleadings (Dkt. No. 16) is **DENIED**; and the Court further

**ORDERS** that the Commissioner's cross-motion for judgment on the pleadings (Dkt. No. 18) is **GRANTED**; and the Court further

**ORDERS** that Plaintiff's complaint is **DISMISSED**; and the Court further

**ORDERS** that the Clerk of Court shall enter judgment in the Commissioner's favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: May 19, 2022
      Albany, New York

Mae A. D'Agostino
U.S. District Judge